No. _____

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____


**ALFRED BOURGEOIS,**

**Petitioner,**

**v.**

**UNITED STATES OF AMERICA,**

**Respondent**

_____


## MOTION FOR ORDER AUTHORIZING THE SOUTHERN DISTRICT OF TEXAS TO CONSIDER A SUCCESSIVE PETITION UNDER 28 U.S.C. § 2255

_____

Victor Abreu
Stuart Patchen
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Victor_Abreu@fd.org
Stuart_Patchen@fd.org

Counsel for Petitioner

Dated:  March 27, 2018

1

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................1

PROCEDURAL HISTORY...........................................................................3

ARGUMENT ..................................................................................................5

I.   Mr. Bourgeois is Intellectually Disabled.............................................5

    A.  Mr. Bourgeois has subaverage intellectual functioning...............6

    B.  Mr. Bourgeois displays significant adaptive deficits....................8

        1.  Formal testing...................................................................10

        2.  Records and lay witness evidence......................................13

        3.  Risk factors associated with intellectual disability ............21

    C.  Mr. Bourgeois' intellectual and adaptive impairments predate the age of eighteen. ......................................................................27

II.  Mr. Bourgeois Meets The Requirements Of § 2255(h)(2) For Filing A Successive Petition. ........................................................................27

    A.  *Atkins* established a new rule of constitutional law that was made retroactive on collateral review..................................................28

    B.  The new rule established in *Atkins* was previously unavailable to Mr. Bourgeois. .........................................................................28

        1.  Post-*Atkins* jurisprudence in this Circuit made relief unavailable to some intellectually disabled individuals.............................................28

        2.  *Moore* rejected the Fifth Circuit's approach to intellectual disability factors as contrary to *Atkins*...............................................31

        3.  This Court has already held that *Atkins* was "previously unavailable" prior to *Moore*.................................................34

        4.  The District Court relied on nonclinical standards to deny *Atkins* relief in violation of *Moore*. ..................................................35

III. The Bar Against Successive Petitions Raising Claims Presented in a Prior Petition Does Not Apply to Prisoners in Federal Custody...............................45

CONCLUSION ...........................................................................................46

# TABLE OF AUTHORITIES

**Federal Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................ *passim*

*Bell v. Cockrell*, 310 F.3d 330 (5th Cir. 2002) ....................................................... 2

*Cathey v. Davis* (In re Cathey), 857 F.3d 221 (5th Cir. 2017) .................... 3, 34, 35

*Clark v. Quarterman*, 457 F.3d 441 (5th Cir. 2006) .................................. 30, 36, 40

*Eldridge v. Quarterman* 325 F. App'x. 322 (5th Cir. 2009) ................................ 30

*Esparza v. Thaler*, 408 F. App'x. 787 (5th Cir. 2010) ......................................... 30

*Henderson v. Stephens*, 791 F.3d 567 (5th Cir. 2015) .................................... 39-40

*Hodge v. United States Dep't of Justice*, 929 F.2d 153 (5th Cir. 1995) ............... 46

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ..................................................... 28

*In re Sparks*, 657 F.3d 258 (5th Cir. 2011) ............................................................ 2

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993) ................................................................................................... 45

*May 15, 2006.* 547 U.S. 1132 (2006)(2006) ......................................................... 3

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ....................................................... *passim*

*Moreno v. Dretke*, 450 F.3d 158 (5th Cir. 2006) ............................................ 30, 36

*October 6, 2014. Bourgeois v. United States*, 135 S. Ct. 46 (2014)(2014) ............ 4

*Ortiz v. United States*, 664 F.3d 1151 (8th Cir. 2011) .................................... 40, 41

*Reyes–Requena v. United States*, 243 F.3d 893 (5th Cir. 2001) ............................ 5

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ............................................. 45

*TennesValley Auth. V. Hill*, 437 U.S. 153 (1978) ........................................... 45-46

*Thomas v. Quarterman*, 335 F. App'x. 386 (5th Cir. 2009) ................................ 30

*United States v. Bourgeois*, 537 F.App'x. 604 (5th Cir. 2013) .............................. 4

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005) ..................................... 3

*United States v. Bourgeois, No. C-02-CR-216*, 2011 WL30684 (S.D. Tex. May 19, 2011) ....................................................................................................... 4, 12, 14

*Williams v. Quarterman*, 293 F. App'x. 298 (5th Cir. 2008) ......................... 30, 36

*Woods v. Quarterman*, 493 F.3d 580 (5th Cir. 2007) ............................................. 30

**Federal Statutes**

28 U.S.C § 2244 ................................................................................... 5, 45, 46

28 U.S.C. § 2255 ......................................................................... 1, 3, 4, *passim*

28 U.S.C. § 2241 ........................................................................................ 3

28 U.S.C. § 2254 ....................................................................................... 45

**State Cases**

*Briseno. Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) ................. 28, 39

Petitioner, Alfred Bourgeois, through undersigned counsel, respectfully applies for an order authorizing the Southern District of Texas to consider a successive  motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2255(h)(2) and Fifth Circuit Rule of Appellate Procedure 22.

**INTRODUCTION**

Alfred Bourgeois is intellectually disabled. He meets the three prongs of intellectual disability under current clinical definitions: subaverage intellectual functioning, adaptive deficits, and onset before age 18. His unadjusted IQ scores of 70 and 75, like his properly adjusted scores of 70 and 68, each establish subaverage intellectual functioning. Standardized testing, contemporaneous records, and numerous witnesses attest to his profound adaptive impairments in conceptual, social, and practical skills—any one of which is sufficient to establish adaptive deficits. And Petitioner's lifelong intellectual and adaptive impairments long predate his eighteenth birthday.

Mr. Bourgeois raised a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), in his first § 2255 motion, but the District Court denied it. Applying this Court's then-valid precedent, the District Court refused to analyze Petitioner's IQ scores under clinical standards. The court instead rejected a finding of subaverage intellectual functioning by relying on various unscientific stereotypes to conduct "a full review of his life" and determine Petitioner's "true IQ." The court likewise

rejected a finding of adaptive deficits—again following this Court's precedent and refusing to apply clinical standards—by focusing on Petitioner's strengths and abilities and by pointing to stereotypes that some laypersons deem inconsistent with intellectual disability.

The District Court's application of the *Atkins* rule, and the precedent on which it relied, were abrogated by the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017). *Moore* made clear that courts *must* apply the *Atkins* rule according to current clinical standards; that adaptive deficits *must* be analyzed according to a defendant's impairments, not his strengths; and that lay stereotypes are an improper and unconstitutional substitute for the scientific evaluation of intellectual disability. *Moore* dictates that the previously unavailable *Atkins* rule is now available to Petitioner.

Accordingly, this Court should authorize a successive motion under 28 U.S.C. § 2255 because Petitioner makes a prima facie showing that his successive motion relies upon "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *In re Sparks*, 657 F.3d 258, 260 (5th Cir. 2011) (quoting 28 U.S.C. § 2255(h)(2)). Mr. Bourgeois' proposed, attached § 2255 motion is based on the rule announced in Atkins; the *Atkins* rule applies retroactively, *see Bell v. Cockrell*, 310 F.3d 330 (5th Cir. 2002); and the *Atkins* rule was "previously unavailable" to Petitioner under

then-valid precedent. *See Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 232 (5th Cir. 2017) (holding that *Atkins* was "previously unavailable" to petitioner whose first habeas petition was filed after *Atkins*, but pre-*Moore* precedent precluded a finding of intellectual disability).

As discussed in detail below, the District Court denied Petitioner's *Atkins* claim based on the same precedent, standards, and departures from clinical guidelines that were struck down in *Moore*. Mr. Bourgeois' *Atkins* claim is now available and should be heard by the District Court.

## PROCEDURAL HISTORY

In 2004, Alfred Bourgeois ("Mr. Bourgeois" or "Petitioner") was convicted of capital murder and sentenced to death in the United States District Court for the Southern District of Texas for the 2002 death of his two-year-old daughter, J.G. On August 25, 2005, this Court affirmed Mr. Bourgeois' conviction and sentence on direct appeal. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005). The Supreme Court denied his petition for writ of certiorari on May 15, 2006. 547 U.S. 1132 (2006).

On May 14, 2007, Mr. Bourgeois filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 challenging his conviction and sentence of death ("§ 2255 Motion"). He raised fifteen claims, including that he was intellectually disabled and his death sentence was

unconstitutional pursuant to *Atkins*. On May 19, 2011, the district court denied that motion. *United States v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684 (S.D. Tex. May 19, 2011). Mr. Bourgeois filed a Notice of Appeal and an Application for a Certificate of Appealability ("COA"), which a panel of this Court denied on August 5, 2013. *United States v. Bourgeois*, 537 F.App'x. 604 (5th Cir. 2013). The Supreme Court denied certiorari review on October 6, 2014. *Bourgeois v. United States*, 135 S. Ct. 46 (2014).

Based on this Circuit's precedent at the time, which controlled the district court's resolution of his intellectual disability claim, Mr. Bourgeois did not seek a COA on his *Atkins* claim.

On May 28, 2017, the Supreme Court issued its decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017). *Moore* invalidated this Circuit's approach to determining eligibility for *Atkins* relief, thereby making the rule articulated in *Atkins* available to Mr. Bourgeois for the first time. Mr. Bourgeois now requests authorization from this Court to file a second or successive petition pursuant to 28 U.S.C. § 2255(h)(2). Pursuant to 28 U.S.C. § 2255(f) and (h), this application is timely as it is filed within one year of the date the Supreme Court decided *Moore*.

**ARGUMENT**

Section 2255 authorizes this Court to certify that a successive § 2255 motion is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). Certification is appropriate where, as here, the petitioner makes a prima facie showing that the requirements of § 2255(h)(2) are met. *Reyes–Requena v. United States*, 243 F.3d 893, 897-99 (5th Cir. 2001).

A prima facie showing is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Id.* (quoting *Bennet v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)). Mr. Bourgeois makes a prima facie showing that (1) he is intellectually disabled and merits *Atkins* relief, (2) that *Atkins* is a new rule of constitutional law that was made retroactive on collateral review, and (3) that the rule was previously unavailable to him.

Lastly, Mr. Bourgeois shows that 28 U.S.C § 2244(b)(1)'s bar against the re-litigation of claims raised in a prior petition does not apply to federal prisoners.

## I.     MR. BOURGEOIS IS INTELLECTUALLY DISABLED.

In *Atkins*, 536 U.S. 304, the Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. The Supreme Court made clear that courts are bound by prevailing clinical standards in its *Atkins* determinations and do not have "complete autonomy to

define intellectual disability as they wish." *Moore*, 137 S. Ct. at 1052-53

(quotations omitted). The Supreme Court cited the two main diagnostic authorities

in the field of intellectual disability as embodiments of the prevailing medical

standards: the American Association of Intellectual and Developmental Disabilities

("AAIDD") and the American Psychiatric Association ("APA"). *Atkins* adopted a

clinical definition of intellectual disability that requires (1) subaverage intellectual

functioning; (2) accompanied by significant limitations in adaptive skills; (3) that

became manifest before age eighteen. *Atkins*, 536 U.S. at 318. As set forth in more

detail in the attached, proposed § 2255 motion, Mr. Bourgeois satisfies each of the

three prongs of intellectual disability; at a minimum, he has made a prima facie

showing that he is a person with intellectual disability.

A.    **Mr. Bourgeois has subaverage intellectual functioning.**

As explained more fully in Petitioner's proposed motion, Mr. Bourgeois has

subaverage intellectual functioning. The APA and the AAIDD define deficient

intellectual functioning as an intelligence quotient ("IQ") of approximately 70 with

a confidence interval derived from the standard error of measurement ("SEM")

taken into consideration. *See* Am. Psychiatric Assoc'n, *Diagnostic and Statistical*

*Manual of Mental Disorders* (5th Ed. 2013) ("DSM-5") at 37.[1] Because a 95%

confidence interval on IQ tests generally involves a measurement error of five

points, at a minimum, scores up to 75 also fall within the mental retardation range.

*Id.* Put differently, if any part of the 95% confidence interval surrounding the

obtained score reaches 70 or below, this prong is satisfied. *Id.*

IQ scores must be corrected for the Flynn Effect. The Flynn Effect reflects a

well-established finding that the average IQ score of the population increases at a

rate of 0.3 points per year or 3 points per decade, and best practices require that

any IQ score be corrected downwards at a rate of 0.3 points per year since the test

was normed. *See User's Guide: Mental Retardation, Definition, Classification and

Systems of Supports*, 10th Ed., AAIDD (2007) ("AAIDD-2007")[2] at 23; DSM-5 at

37.

Mr. Bourgeois was administered two IQ tests—one prior to trial, and one

prior to the filing of his first § 2255 motion. Both times, his IQ was determined to

be in the intellectually disabled range. First, one week prior to trial, on February

---

[1] The DSM is the handbook published by the APA and is updated periodically. Citations to the DSM are followed by a number indicating the version of the DSM referred to.

[2] The AAIDD User's Guide is updated periodically. Citations to the AAIDD User's Guide will consist of "AAIDD" followed by the publication year of the User's Guide referenced.

28, 2004, Petitioner was administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) by neuropsychologist Dr. Donald E. Weiner and obtained a full-scale IQ score of 75. *See* Exh. 1 (Dr. Weiner Score Sheet from WAIS-R); Exh. 2 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/3/04)[3]. This result put him in the range of intellectual disability, but overstated his IQ score due to the Flynn Effect, because the WAIS-R was normed in 1978. Properly adjusted, Mr. Bourgeois' 2004 score reflects an IQ of 68. *See* Exh. 3 (Declaration of Dr. Michael M. Gelbort at ¶ 5). Second, in 2007, Petitioner was administered the Wechsler Adult Intelligence Scale-III ("WAIS-III"), which had succeeded the WAIS-R. Mr. Bourgeois obtained an IQ of 70 on the WAIS-III. *See* Exh. 3 (Gelbort Declaration at ¶ 3). Because Mr. Bourgeois' scores fall within the range for intellectual disability, a court determining whether he qualifies for *Atkins* relief must "move on to consider [his] adaptive functioning." *Moore*, 137 S. Ct. at 1049.

**B.     Mr. Bourgeois displays significant adaptive deficits.**

The AAIDD has defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their

---

[3] All exhibits referenced herein were previously submitted in conjunction with Petitioner's initial § 2255 motion, his 2010 evidentiary hearing, or his application for COA filed in this court. Citations to "Exh." refer to the exhibits attached to Petitioner's proposed motion. Citations to "NT" refer to transcripts of testimony and are specified by date and page number.

everyday lives." AAIDD-2010 at 15. The DSM-5 defines adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5 at 37.

The AAIDD and the APA have indicated that the adaptive deficits prong is satisfied if there is a significant limitation in one of the following three types of adaptive behavior: conceptual, social, or practical; or in the composite of the individual's adaptive functioning. AAIDD-2010 at 43; DSM-5 at 37.

As it is expected that strengths co-exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. "[S]ignificant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD-2010 at 47. People with intellectual disability may have "strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." AAIDD-2002. Accordingly, "the medical community focuses the adaptive functioning inquiry on adaptive deficits" rather than strengths. *Moore*, 137 S. Ct. at 1050.

While deficits in only one of the three adaptive-skills domains suffices to meet the adaptive deficits prong, extensive lay-witness evidence, records, and

psychological testing confirm that Petitioner suffered from significant adaptive deficits before the age of eighteen in all three domains recognized by the AAIDD and the DSM-5.

### 1.    Formal testing

In 2009, clinical psychologist Victoria Swanson, Ph.D., administered the Vineland Adaptive Behavior Scales, 2d Edition ("Vineland-II"), a standardized measure commonly used to evaluate limitations in adaptive behavior to Beverly Frank, a childhood neighbor of Mr. Bourgeois. *See* Exh. 4 (Declaration of Victoria Swanson, Ph.D. at ¶ 2). Dr. Swanson also administered the Adaptive Behavior Assessment System ("ABAS"), a second commonly used standardized measure of adaptive functions, to Ms. Frank. *See* Exh. 5 (Supplemental Report of Victoria Swanson, Ph.D. at 2).

Dr. Swanson's testing indicates profound deficits in adaptive functioning in all three of the domains recognized by the AAIDD and the DSM-5 (conceptual, practical, and social), as well as in the composite score of Petitioner's overall adaptive functioning. In all three of those domains and the composite score, Dr. Swanson's testing returned scores that were more than two standard deviations

below the mean[4] and well into the impaired range. As she summarizes in her declaration:

> Mr. Bourgeois scored a 66 on the Vineland-II. On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization. These scores place him well within the range of mental retardation in the sphere of adaptive deficits. They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

Exh. 4 (Declaration of Victoria Swanson, Ph.D. at ¶ 5). The results from the ABAS likewise "showed Mr. Bourgeois to have significant adaptive deficits." Exh. 5 (Supplemental Report of Victoria Swanson, Ph.D. at 2).

Along with the testing administered to Ms. Frank, Dr. Swanson interviewed a number of other individuals who knew Mr. Bourgeois at various points in his life. The information provided by these informants confirmed Dr. Swanson's "opinion that Mr. Bourgeois exhibited significant deficits in his adaptive functioning throughout his childhood and into adulthood." *Id.*

Dr. Swanson also directly tested Mr. Bourgeois to assess his adaptive functioning. She administered the Woodcock-Johnson Third Edition Tests of Achievement ("WJ-III") to Petitioner to "determine current academic functioning." Exh. 5 (Supplemental Report of Victoria Swanson, Ph.D. at 2). Dr. Swanson explained the test and summarized her results as follows:

---

[4] The mean is a score of 100 and one standard deviation is 15 points.

The WJ-III (Mean, 100; SD, IS) is a wide range, comprehensive set of individually administered tests for measuring cognitive abilities, scholastic aptitudes, and achievement. The test assesses a wider range of academic areas at a greater depth than any other standardized, individually administered, academic battery currently available. The WJ-III is nationally standardized on subjects aged 24 months to 95 years of age, and is considered the "gold standard" for assessing academic abilities. Although Mr. Bourgeois attended four years of high school, his scores on the WJ-III are in the range of mental retardation.

*Id.*

Petitioner's individual achievement test scores on the WJ-III include: story recall at a kindergarten level; applied problem solving at a second grade level; oral comprehension and passage comprehension at a third grade level; writing samples and understanding directions at a fourth grade level; calculation, reading fluency, and writing fluency at a fifth grade level; and math fluency at a sixth grade level. *See* Exh. 6 (WJ-III Score Report). The only tests on which he scored above a sixth grade level – letter-word identification (eighth grade) and spelling (thirteenth grade) – are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher-level thinking.[5] The primary significance of these

---

[5] In analyzing Petitioner's initial *Atkins* claim in 2011, the court stated that "Bourgeois scored low on some areas, but also in the high school range for spelling and reading." *Bourgeois*, 2011 WL 1930684, at *40. In fact, the only "high school range" score he received was for spelling. His "broad reading score," which is a cluster score measuring several abilities, was at a fifth grade level, as was his reading fluency, as noted above. *See* Exh. 6. Passage comprehension was at a third grade level. *Id.* To the extent the court was referring to Petitioner scoring at an eighth grade level on "letter-word identification," it is worth noting that this score

higher scores, therefore, is that they support Dr. Swanson's conclusion that Mr. Bourgeois was not malingering; he scored well where he could, even if the scores still reflect limited academic functioning for an adult. *See* NT 09/20/10 at 57-58.

Finally, Mr. Bourgeois' neuropsychological testing showed significant adaptive deficits. The test battery as a whole revealed overall brain impairment. Mr. Bourgeois' memory was impaired, as was his ability to process new information, learn, think conceptually, and comprehend new topics. *See* NT 10/09/10 at 26; Exh. 2 (Weiner Declaration at ¶ 3); Exh. 7 (Declaration of Dr. Jethro Toomer at ¶ 10).

### 2. Records and lay witness evidence

Records and lay witnesses substantiate the significant adaptive deficits revealed by Dr. Swanson's testing.

### a. Conceptual domain

*Academic Functioning*

---

is testing only the subject's ability to "identify[] printed letters and words." Alan S. Kaufman & Elizabeth O. Lichtenberger, *Assessing Adolescent and Adult Intelligence* 575 (2006). It should also be noted that, under current clinical standards, the fact that an adult scores at the eighth grade level in a particular area is not inconsistent with a finding of adaptive impairment. Rather, the DSM-5 instructs that an adult qualifies as mildly intellectually disabled where "abstract thinking, executive function. . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired," without referencing any specific grade equivalency. DSM-5 at 34.

Mr. Bourgeois' Lutcher High School transcript reveals a child with low intelligence who struggled in school. He achieved poor grades across all subjects in high school, with a median score of C to D. In addition, he attended basic level classes. For example, the highest level of math studied was first year algebra. This was only a half credit course taken in his third year of high school, and he obtained a D. *See* Exh. 8 (Lutcher High School Transcript dated 5/24/83).

Mr. Bourgeois was raised by a very poor family in a small rural town in Louisiana. There are no records that he was ever tested for special education, or whether such services were even available.[6] Although no records existed for Mr. Bourgeois' elementary school career, family members reported that Mr. Bourgeois failed a grade in elementary school and received speech therapy. Exh. 5 (Swanson Supplemental Report at 3). "Reporters also advise[d] that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money." *Id.*

---

[6] The availability of services for Mr. Bourgeois is highly doubtful in light of the fact that his older brother, who suffered from cerebral palsy, did not receive any services in the state of Louisiana until 2001, when he was middle-aged. *See* NT 09/20/10 at 41.

14

Other records confirmed that Mr. Bourgeois struggled with academics. For instance, in 1985, Mr. Bourgeois attempted to qualify for permanent employment with the St. John the Baptist Parish Sheriff's Office. His training instructor, Lt. David M. Wilson, described Mr. Bourgeois' conceptual difficulties, noting that Mr. Bourgeois was given two opportunities to pass the firearms test, participated in fifty-four hours of training in preparation for the test, and still failed. Mr. Bourgeois' failure on the firearms test, and his "poor performance scholastically," made further training "unfruitful and unwarranted." *See* Exh. 9 (Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85).

Mr. Bourgeois also underwent a psychological evaluation pursuant to his application to the St. John the Baptist Parish Sheriff's Office. The resulting report notes that Mr. Bourgeois had to repeat a grade in school. *See* Exh. 10 (Psychological Evaluation by Morris & McDaniel, Inc. dated 5/22/85).

Petitioner's results on the WJ-III achievement tests confirm his low level of academic functioning, reflecting scores below age related expectations for every subject except spelling.

*Executive Functioning and Self-Direction*

Mr. Bourgeois had deficits in executive functioning and self-direction from a very young age. As a child, he was slow to learn, had difficulty following

15

directions, and required repeated instruction. *See* Proposed Second § 2255 Motion at 17-19.

Petitioner's childhood neighbor Beverly Frank describes him as a child who could not "catch on to things" and "who had to have the rules explained to him over and over again." Exh. 13 (Declaration of Beverly Frank at ¶ 7). She continued:

> Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.
>
> My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

*Id.* at ¶¶ 7-8.

Likewise, his sister Claudia Williams recalls that Alfred "couldn't learn," no matter that his slowness would get him a beating:

> [Alfred] didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Exh. 14 (Declaration of Claudia Williams at ¶ 5).

These problems continued into adulthood. He had difficulties with comprehension, problem solving, and impulse control, and still required repeated instruction. *See*, *e.g.*, Exh. 15 (Declaration of Michelle Armont at ¶ 8) ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem."); *id.* ("Things that would be obvious to a normal person were not obvious to Alfred."); Exh. 11 (Declaration of Michelle Warren at ¶ 16) ("It was like [Alfred] had a block and could not reason things out or change his behavior."); Exh. 16 (Declaration of Ivy Thomas at ¶ 4) ("Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

Mr. Bourgeois' decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions. In the words of his half-sister, Michelle Armont, "Alfred could not consider the consequences of his actions." Exh. 15 (Declaration of Michelle Armont at ¶ 8).

The results of the neuropsychological testing discussed above confirm these witness reports. Mr. Bourgeois has difficulty learning, processing new information, and dealing with new situations, as well as problems with his memory. After reviewing this testing, combined with her "own observations and evaluations," Dr.

Swanson concluded that "Mr. Bourgeois is deficient in his ability to absorb and understand information" and "is significantly impaired in his ability to solve problems." Exh. 5 (Supplemental Report of Victoria Swanson at 3).

*Communication*

Mr. Bourgeois scored at the third and fourth grade level on the WJ-III for oral comprehension, oral language, and listening comprehension, all of which directly assesses receptive, expressive, and functional communication. NT 09/20/10 at 58.[7]

---

[7] The DSM-IV-TR, which was the most current edition at the time of Petitioner's initial § 2255 proceedings , provided that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth-grade level." DSM-IV-TR at 43. However, the current DSM-5 does not include such a specific cut-off in the description of mild intellectual disability. Instead, when summarizing the level of functioning necessary for significant impairments in the conceptual domain, it states: "For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function. . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." DSM-5 at 34. By contrast, the sixth-grade cut off is used in the description of moderate intellectual disability. *Id.* at 35. Hence, under current diagnostic standards, the fact that so many of Petitioner's achievement scores fell below the sixth grade level indicates that he is not just mildly intellectually disabled, but falls within the moderate level of severity. *See* Proposed Second § 2255 Motion at 14-15 (discussing Petitioner's scores on the Woodcock-Johnson achievement tests, the vast majority of which fell below sixth grade equivalency). Moreover, under the DSM-5, even if Mr. Bourgeois' scores were at or above age-related expectations, that still would not rule out a diagnosis of intellectual disability as significant impairments in only one of the three domains of adaptive functioning is necessary for prong two to be satisfied.

18

### b. Social deficits

Childhood playmates recall Petitioner's difficulties in the social realm. His family and neighbors remember him as a slow and awkward child who had difficulty playing with the other children and "fitting in." He was emotionally fragile, unable to avoid social victimization, and cried with little provocation. *See* Proposed Second § 2255 Motion at 20-21.

Witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments consistent with intellectual disability. *See* DSM-5 at 34 (significant deficits in the social domain include "difficulties regulating emotion and behavior in age-appropriate fashion"); Elaine E. Castles, *We're People First: The Social and Emotional Lives of Individuals with Mental Retardation*, at 26 (1996) ("Cognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations.").

Mr. Bourgeois' social abilities did not improve with age. A psychiatric evaluation conducted in 1985, when Petitioner was twenty-one years old, reported that Mr. Bourgeois had problems in evaluating his self-worth and had low self-esteem, consistent with deficiencies in social adaptive functioning. *See* Exh. 10 (Psychological Evaluation).

Mr. Bourgeois also proved unable to maintain a healthy intimate relationship. He was married to four different women. Consistent with the

executive functioning and emotional dysregulation issues discussed above, each marriage was characterized by dysfunction and ultimately failed. Indeed, all of his relationships were unstable due to his inability to regulate his emotions. *See* Proposed Second § 2255 Motion at 21.

### c. Practical deficits

As a child, Mr. Bourgeois proved unable to follow simple directions, which implicates both the conceptual and the practical domain. *See* discussion of conceptual domain, *supra*. Mr. Bourgeois "was delayed compared to his peers in learning simple skills like tying his shoes and counting money," and it "took young Alfred much more time than his peers to learn how to ride a bike." Exh. 5 (Supplemental Report of Victoria Swanson at 4). He also had difficulties dressing himself and learning new games, and had to rely on others for assistance with his daily living activities. *See* Proposed Second § 2255 Motion at 21-22.

His practical deficits persisted through adulthood. He had difficulty understanding and managing money. He bought things he could not afford and did not understand how difficult it would be to pay for them. *See* Proposed Second § 2255 Motion at 22-23. For example, Mr. Bourgeois failed to comply with the terms of a lease he had made with the Ford Motor Credit Company. He agreed to lease a $40,000 Ford Explorer, but failed to make the payments. In addition to the price tag being well beyond his means, the lease agreement shows that he agreed to put

down over $9,000 on a lease, and with his monthly payments, he would have paid a total of over $26,000 only to return the vehicle after three years. He would have been better off buying the car. *See* Exh. 20 (*Ford Motor Credit Company vs. Alfred Bourgeois* Suit on Net (Closed End) Lease filed 4/25/03).

Mr. Bourgeois is also described as oblivious towards safety. As a teenager, he drove a four-wheeler "straight into a pole." Exh. 17 (Declaration of Russell, Jr. at ¶ 4); *see also* Exh. 14 (Declaration of Claudia Williams at ¶ 6). As an adult, acquaintance Lawanda Cook indicated that he took "crazy chances in the truck he drove. . . . [O]ne time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all." Exh. 12 (Declaration of Lawanda Cook at ¶ 3).

### 3. Risk factors associated with intellectual disability

The scientific community recognizes a number of risk factors associated with intellectual disability, a number of which are present in Mr. Bourgeois' life history.

#### *Impaired Parenting*

Mr. Bourgeois was the fifth of seven children born to Eunice Bourgeois. All seven children were born in a time span of under nine years and were conceived by four different fathers. *See* NT 09/21/10 at 6-7; Exh. 21 (Mitigation PowerPoint by

21

Mark D. Cunningham, Ph.D. at 3). Eunice was "overwhelmed" by the number of children in her care. NT 09/21/10 at 133-34.

Eunice was chronically depressed by the time Mr. Bourgeois was born. She first became depressed when the father of her first three children suddenly abandoned her. Exh. 22 (Declaration of Elnora McGuffy ¶ 2); Exh. 23 (Declaration of Jersey Henry at ¶ 3). Her depression worsened when her mother died while Eunice was in the hospital delivering her fourth son. Exh. 24 (Declaration of Wilmer Bourgeois at ¶ 7). Then, her son Clyde died at the age of twelve when he fell out of a boat and drowned. Exh. 11 (Declaration of Michelle Warren at ¶ 3). Eunice was also an alcoholic and drank to the point of intoxication every day. *See* NT 09/21/10 at 132-34, 397.

Eunice's alcoholism and the stress of raising so many children on her own caused her to forget what "was important in life regarding raising her children," including such basic tasks as sending them to school. *Id.* at 132-33. Family members concurred that Eunice failed to fulfil her role as a parent to Petitioner and his siblings. *See, e.g.*, Exh. 25 (Declaration of Wilmer Bourgeois at ¶ 4) ("Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother."); Exh. 25 (Memoranda Generated by Gerald Bierbaum at 39) (quoting Harry Bourgeois, Eunice's cousin, as saying: "Alfred's momma

22

didn't do shit for him. . . . All her kids raised they self. . . . It was like he didn't

have no momma.").

### *Child Abuse and Neglect*

Eunice physically abused her children, and had a special fixation on Mr.

Bourgeois. Beverly Frank explains:

> Eunice whipped all her children. She was a single parent for several
> years and she disciplined the children herself. Eunice would use a
> switch or anything else she could get her hands on to whip the
> children. I know she would whip the children so much that they would
> have welts on their body. I believe you should never whip a child that
> much.

Exh. 13 (Declaration of Beverly Frank at ¶¶ 3-4). Claudia Williams, Petitioner's

sister, likewise recounts:

> Both those things [*sic*] [losing one child to drowning and having a
> second who was disabled] took a lot of our mother's attention and
> may have contributed to the beatings she gave us. . . .

> Alfred got more whippings than the rest of us. He didn't seem to be
> able to control his behavior and know when to stop doing something
> that would get him in trouble. He would get beat for the same thing
> over and over like he just couldn't learn. Like the rest of us he got
> beat sometimes for nothing and then he got beat because he was just
> stupid and kept doing things that got him beat.

Exh. 14 (Declaration of Claudia Williams at ¶¶ 3-5); *see also* Proposed Second §

2255 Motion at 24-26 (describing additional instances of abuse).

Ultimately, Mr. Bourgeois was cast out by his mother, who sent him at the

age of seven or eight to live with an elderly neighbor, Miss Mary Clayton. *See*

Exh. 29 (Declaration of Mark Cunningham at ¶ 23). Even after Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half-sister, Michelle. As Dr. Toomer explained, "the abandonment that [Mr. Bourgeois] experienced in the family unit by the mother had significant effect and impact on his overall functioning." NT 09/21/10 at 288-89.

Meanwhile, Petitioner was completely abandoned by his paternal father, Alfred Sterling, who "provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois." Exh. 29 (Declaration of Mark Cunningham at ¶ 19).

### *Sexual Abuse*

In addition to the parental abuse and neglect Mr. Bourgeois experienced, he was raped over the course of several years by Miss Mary's son. *See* NT 09/21/10 at 142-43; 09/20/10 at 292.

### *Low Socioeconomic Status*

Mr. Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one lane dirt road connecting about twenty homes, representing two or three different family units. NT 09/21/10 at 8-9; *id.* at 395. A family friend who was raised in the same neighborhood described it as consisting of "[p]oor black families." NT 3/23/04 at 121. The neighborhood was

surrounded by sugar cane fields, and hemmed in on one side by the river. NT 09/21/10 at 9. The Bend was not connected to a sewage line. *Id.* at 141.

While poverty is itself one social risk factor, low socioeconomic status also signals the presence of others, including malnutrition, educational inadequacy, insufficient stimulation, and deficient medical and/or educational interventions. *See* AAIDD-2010 at 60. Thus, as explained by the government's expert, Dr. Randall Price, Mr. Bourgeois' "lack of education, . . . impoverishment and the lack of cultural enrichment" bore a "relationship to his low intelligence." NT 09/24/10 at 51-52; *see also* NT 09/23/10 at 232 (Dr. Price acknowledging that Mr. Bourgeois' "cultural, spiritual, [and] economic" impoverishment was relevant to "his cognitive intelligence").

### Brain Damage

According to Dr. Gelbort:

> Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobes. This is most prominently evidenced by his very impaired performance on the Category Test. This test is one of the most sensitive to both whole brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

Exh. 3 (Declaration of Michael Gelbort at ¶ 7); *see also* NT 09/20/10 at 232-39, 244 (Dr. Weiner testifying that Petitioner's neurological testing showed brain

damage); NT 11/10/10 at 26 (government expert Dr. Price testifying: "I would agree that these scores [Dr. Weiner's] on the tests that were administered using the overall Heaton norms would be consistent with impairment in those areas that are sensitive to brain dysfunction.").

### *History of Learning Difficulties*

Childhood learning difficulties also constitute risk factors for intellectual disabilities as they correlate with declines in IQ during the developmental period. As discussed above, Mr. Bourgeois is reported to have failed a grade in elementary school and required speech therapy. Exh. 5 (Supplemental Report of Victoria Swanson at 3). He is also said to have "had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills." *Id*.

### *Family Heredity Risk*

Mr. Bourgeois has a family history of intellectual and adaptive impairments. His older brother, Anthony, was born with cerebral palsy and profoundly intellectually disabled. *See* Proposed Second § 2255 Motion at 28.

Additionally, Petitioner's mother, Eunice, was described by her brother as "not that smart and slow in understanding." Exh. 24 (Declaration of Wilmer Bourgeois, Sr. at ¶ 3); *see also* Exh. 25 (Bierbaum Memorandum at 39) (quoting Harry Bourgeois, Eunice's cousin, describing Eunice as "half-ass retarded").

26

### C. Mr. Bourgeois' intellectual and adaptive impairments predate the age of eighteen.

Evidence of Mr. Bourgeois' intellectual disability has existed since his early childhood. As detailed above, interviews of people who have known Mr. Bourgeois since childhood reveal that, throughout his youth and into adulthood, Mr. Bourgeois exhibited intellectual and adaptive impairments that affected all facets of his life. Based on such interviews and other sources, Dr. Swanson concluded that "it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood." Exh. 5 (Supplemental Report of Victoria Swanson at 4). The various risk factors discussed above also corroborate an onset prior to age eighteen.

Mr. Bourgeois has established that he meets the three prongs of intellectual disability under current clinical definitions: subaverage intellectual functioning, adaptive deficits, and onset before age eighteen. He is intellectually disabled. At a minimum, he has made a prima facie showing that he is a person with intellectual disability.

## II. MR. BOURGEOIS MEETS THE REQUIREMENTS OF § 2255(H)(2) FOR FILING A SUCCESSIVE PETITION.

Mr. Bourgeois' proposed § 2255 motion is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme

Court, that was previously unavailable" and thus Mr. Bourgeois meets the

requirements of 28 U.S.C. § 2255(h)(2).for filing a successive petition.

**A.** ***Atkins*** **established a new rule of constitutional law that was made retroactive on collateral review.**

In *Atkins*, the Supreme Court held that the execution of intellectually

disabled individuals violated the Eighth Amendment's prohibition against cruel

and unusual punishment. *Atkins*, 536 U.S. at 321. Further, "[t]here is no question

that *Atkins* created a new rule of constitutional law (i.e., that the intellectually

disabled are categorically ineligible for the death penalty), made retroactive to

cases on collateral review by the Supreme Court." *In re Campbell*, 750 F.3d 523,

530 (5th Cir. 2014). Accordingly, this Motion meets the first two requirements of

§ 2255(h)(2).

**B.** **The new rule established in** ***Atkins*** **was previously unavailable to Mr. Bourgeois.**

**1.** **Post-***Atkins* **jurisprudence in this Circuit made relief unavailable to some intellectually disabled individuals.**

The *Atkins* Court left "to the States the task of developing appropriate ways

to enforce the constitutional restriction upon its execution of sentences." *Atkins*,

536 U.S. at 317. Post-*Atkins*, the Court of Criminal Appeals of Texas ("CCA") first

set forth its standards for determining intellectual disability claims in *Briseno*. *Ex*

*parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The methodology adopted

by the CCA divorced the intellectual disability determination from clinical standards and effectively made *Atkins* relief unavailable to petitioners who do not correspond to stereotypes about people with intellectuaal disabilities. Despite the fact that *Atkins* excluded the entire class of intellectually disabled individuals from death penalty eligibility, 536 U.S. at 321, the CCA in *Briseno* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty," noting that "[m]ost Texas citizens might agree that Steinbeck's Lennie should, by virtue of his lack of reasoning ability and adaptive skills, be exempt," *Briseno*, 13 S.W.3d at 11-12. With regards to the adaptive deficits prong of *Atkins*, *Briseno* sought to carve out a subcategory of intellectually disabled persons who would be ineligible for the death penalty and instructed courts to consider seven nonclinical factors in determining who would belong in that category.[8] *See Moore*, 137 S. Ct. at 1051 (rejecting *Briseno* factors because *Atkins*

---

[8] These seven factors were: "(1) Did those who knew the person best during the developmental stage--his family, friends, teachers, employers, authorities--think he was mentally retarded at that time, and, if so, act in accordance with that determination? (2) Has the person formulated plans and carried them through or is his conduct impulsive? (3) Does his conduct show leadership or does it show that he is led around by others? (4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? (5) Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject? (6) Can the person hide facts or lie effectively in his own or others' interests? (7) Putting aside any heinousness or

bars execution of anyone "in the *entire* category of [intellectually disabled] offenders") (citations omitted) (emphasis in original). In *Moore*, the Supreme Court explicitly rejected this use of non-clinical standards in *Atkins* determinations. *Moore*, 137 S. Ct. at 1053.

This Court's *Atkins* jurisprudence followed *Briseno*, departed from clinical standards, and employed a number of analyses that were specifically rejected by *Moore*. *See Moreno v. Dretke*, 450 F.3d 158, 165 (5th Cir. 2006) (citing to the *Briseno* factors in denying a COA on an *Atkins* claim); *Clark v. Quarterman*, 457 F.3d 441, 445-47 (5th Cir. 2006) (affirming state court denial of *Atkins* relief based on *Briseno)*; *Woods v. Quarterman*, 493 F.3d 580, 586-87 (5th Cir. 2007) (same); *Williams v. Quarterman*, 293 F. App'x. 298 (5th Cir. 2008) (same); *Eldridge v. Quarterman* 325 F. App'x. 322, 328-29 (5th Cir. 2009); *Thomas v. Quarterman*, 335 F. App'x. 386, 389-91 (5th Cir. 2009) (same); *Esparza v. Thaler*, 408 F. App'x. 787, 790-96 (5th Cir. 2010) (same).

---

gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Briseno*, 135 S.W.2d at 8.

**2.** *Moore* **rejected the Fifth Circuit's approach to intellectual disability factors as contrary to** *Atkins***.**

In *Moore*, the Supreme Court rejected the *Briseno* factors and their departure from the clinical standard as unconstitutional, finding that they were uninformed by medical consensus as set forth by the AAIDD and the APA and created "an unacceptable risk that persons with intellectual disability will be executed." *Moore*, 137 S. Ct. at 1044. The Court noted that the *Briseno* factors largely excluded individuals determined to have mild intellectual disabilities from obtaining relief pursuant to *Atkins. See id*. at 1051. *Moore* further held that state courts are bound by current medical standards in *Atkins* determinations:

> States have some flexibility, but not unfettered discretion in enforcing *Atkins*' holding. 'If the States were to have complete autonomy to define intellectual disability as they wished, we have observed, Atkins would become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. The medical community's current standards supply one constraint on States' leeway in this area. Reflecting improved understanding over time, current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians.

*Id*. at 1052-53 (citations omitted). The Supreme Court also rejected a number of broader practices applied by other courts, the jurisprudence of which the District Court followed in ruling on Mr. Bourgeois' initial *Atkins* claim asserted in 2006.

**a.** **Under clinical standards and *Moore*, an IQ score that falls within the range for intellectual disability meets prong one.**

First, the *Moore* Court faulted the CCA's approach to assessing the petitioner's intellectual functioning, stating that the CCA was required to move on to the second *Atkins* prong once Moore had established an IQ within the range of intellectual disability. Moore had an IQ score of 74, which, "adjusted for the standard error of measurement, yields a range of 69 to 79. Because the lower range of Moore's score falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning." *Moore*, 137 S. Ct. at 1049 (citations omitted). Despite the fact that Moore's score was within the range for intellectual disability, the CCA disregarded the lower end of range based on "factors unique to Moore." *Id*. *Moore* flatly rejected this approach, holding: "we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id*. at 1050.

**b.** **Clinical standards and *Moore* bar consideration of adaptive strengths, risk factors, comorbid conditions, and erroneous stereotypes when making a prong two determination.**

*Moore* also rejected the *Briseno* court's approach to prong two, faulting the CCA for "overemphasiz[ing] Moore's perceived adaptive strengths. *Moore*, 137 S.

32

Ct. at 1050. *Moore*, citing to clinical standards, acknowledged that intellectually disabled individuals can demonstrate adaptive strengths which do not preclude them from *Atkins* relief, that "the medical community focuses the adaptive functioning inquiry on adaptive *deficits*" rather than strengths, and rejected the CCA's attempt to use the evidence of strengths to "overcome" the evidence of deficits. *See Moore*,137 S. Ct. at 1050  (citing AAIDD-2010 at 47 and DSM-5 at 33, 38).

*Moore* was particularly concerned with the way *Briseno* "advanced lay perceptions of intellectual disability" by inviting courts to consider questions such as "did those who knew the person . . . think he was mentally retarded" when deciding prong two. *Moore*, 137 S. Ct. at 1051.  Similarly, the Supreme Court rejected the use of commonly held, but erroneous stereotypes surrounding individuals with intellectual disability.  *Id.* at 1052 (citing, *inter alia*, AAIDD-2012 at 25-27). *Moore* also rejected the use of risk factors and comorbidities as weighing against a finding of intellectual disability. The Supreme Court explained:

> The CCA furthermore concluded that Moore's record of academic failure, along with the childhood abuse and suffering he endured, detracted from a determination that his intellectual and adaptive deficits were related…. Those traumatic experiences, however, count in the medical community as "*risk factors*" for intellectual disability.

*Moore*, 137 S. Ct. at 1051 (citing AAIDD-11, at 59-60) (emphasis in original). As to comorbidities, *Moore* made clear that "[t]he existence of a

personality disorder or mental-health issue . . . is not evidence that a person does not also have intellectual disability." *Id.* at 1051.

In rejecting the nonclinical approach to intellectual disability employed in the Fifth Circuit, the Supreme Court noted that the flexibility granted to states in enforcing *Atkins* was constrained by "the medical community's current standards" in the exercise of that leeway. *Id.* at 1053. This Court abided by no such constraints, and under the Fifth Circuit's pre-*Moore* jurisprudence, *Atkins*' rule was not available to Petitioner.

### 3. This Court has already held that *Atkins* was "previously unavailable" prior to *Moore*.

This Court has recognized that there is a "gray area of previous unavailability despite technical availability." *Cathey*, 857 F.3d at 230-31. Mr. Bourgeois falls into that gray area—even though *Atkins* had been decided prior to his initial § 2255 motion and Mr. Bourgeois raised an *Atkins* claim in that motion, the new rule established by *Atkins* was functionally unavailable to him because the District Court employed Fifth Circuit precedent that required the use of nonclinical standards which excluded all but the most severely intellectually disabled individuals from relief.

In *Cathey*, this Court determined that *Atkins* was "previously unavailable" to a petitioner who had filed his first habeas petition after *Atkins* was decided

34

because, under the now-invalidated nonclinical standards applied in the Fifth Circuit, he did not qualify as intellectually disabled. *Cathey*, 857 F.3d at 233. IQ tests had shown that the petitioner in *Cathey* had an IQ of 77 at the time of his first petition, while Texas "had declared 70 as the benchmark IQ score" for *Atkins* relief. *Id.* at 232. This Court determined that, in light of his score and the Texas benchmark at the time of his initial petition, an *Atkins* claim was previously unavailable to Mr. Cathey because "a claim must have some possibility of merit to be considered available." *Id*. When the District Court denied Mr. Bourgeois' *Atkins* claim in 2011, it was similarly constrained by Fifth Circuit precedent that made *Atkins* relief functionally unavailable to him, as discussed *infra.*

>    **4.    The District Court relied on nonclinical standards to deny *Atkins* relief in violation of *Moore*.**

In denying the initial § 2255 motion, the District Court, relying on this Circuit's pre- *Moore* jurisprudence, applied the same non-clinical standards rejected by *Moore and Cathey* and rendered *Atkins* relief unavailable to Mr. Bourgeois.

>    **a.    The District Court's intellectual functioning analysis rested on unscientific bases.**

As discussed *supra*, an IQ score of 75 or below satisfies prong one of *Atkins*. Mr. Bourgeois' only two full-scale IQ scores met this threshold—a 75 on the WAIS-R and a 70 on the WAIS-III. *See* Exh. 1 (Dr. Weiner Score Sheet from

WAIS-R); Exh. 2 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/3/04); Exh. 3 (Declaration of Michael Gelbort at ¶ 3). The District Court acknowledged that Mr. Bourgeois' scores qualified him for a diagnosis of intellectual disability, but did not end the inquiry there, as clinical standards required. *Bourgeois*, 2011 WL 193064 at *25. The District Court did not "invalidate or ignore" the IQ testing, nor could it as no expert found Mr. Bourgeois to be malingering. Instead, after recognizing that the IQ testing satisfied the clinical standard for prong one, the District Court explicitly declined to apply this standard, and instead determined that Mr. Bourgeois' IQ score fell at the high end of the confidence interval. *Bourgeois* at 88, 112-113. This was consistent with the Fifth Circuit's pre-*Moore* jurisprudence, which held that courts are "not required to find [an individual] to be mentally retarded merely because the low end of [the] confidence band was below 70[.]" *Clark v. Quarterman*, 457 F.3d at 446; s*ee also Moreno* 450 F.3d at 165 (finding that an individual with an IQ score of 68 was not intellectually disabled because, i*nter alia*, he "appeared to be poorly motivated and exaggerated his deficits . . . obtained his Graduate Equivalency Degree," and his employer testified that he was intelligent); *Williams v. Quarterman*, 293 F. App'x. at 309 (disregarding IQ score of 70 where petitioner had demonstrated academic competence and writing ability).

In failing to find prong one met where Mr. Bourgeois demonstrated IQ scores within the range for intellectual disability, the District Court here claimed that those scores were inconsistent with Mr. Bourgeois' "true IQ" as reflected in the "circumstances" of his testing and "a full review of his life." *Bourgeois*, 2011 WL 193064 at *27. In so doing, the District Court was bound by Fifth Circuit precedent. *See Bourgeois*, 2011 WL 193064 at *26 ("When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the Fifth Circuit has denied relief when . . . notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval."). The District Court was constrained by Fifth Circuit precedent to find that Mr. Bourgeois' IQ scores did not meet prong one, noting that "all cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment." *Bourgeois*, 2011 WL 193064 at *26 (citations omitted).

In disregarding Mr. Bourgeois' IQ scores, the District Court relied on erroneous stereotypes of intellectually disabled people. The Court explained that it "has viewed many hours of video from the examination . . . Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Id*. at 28; *see also id.*at 30

("The Court had sufficient interactions with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses."). The District Court also relied on its determination that: "Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies. He graduated from high school . . . worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances." *Bourgeois*, 2011 WL 193064 at *22. As discussed in section ii, *infra*, the District Court's determination that any of these factors were inconsistent with intellectual disability is contrary to the medical standards and amounts to reliance on the *Briseno* factors and erroneous stereotypes surrounding intellectual disability, and is accordingly not permitted under *Moore*.

The District Court relied on some of the adaptive strengths analysis it would use in deciding prong two, noting that "a disconnect exists between the level at which Bourgeois' experts said he could function and what he could actually do." *Id.* at 29. According to the District Court, the following factors indicated that Petitioner's test scores did not accurately reflect his intelligence:

> [T]hose who knew him as an adult did not suspect that he was mentally retarded. Bourgeois graduated from high school, worked for years as an over-land trucker, bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise *carried himself without any sign of intellectual impairment.*

*Id.* at 30 (emphasis added).

Mr. Bourgeois, the District Court maintained, could not be intellectually disabled, despite what the testing showed, because he did not present himself in the way the District Court thought an intellectually disabled person should present himself. In rejecting the testimony of Dr. Swanson, who said that Mr. Bourgeois had "extremely low cognitive ability," the District Court based its determination on the fact that Mr. Bourgeois "does not operate as a child." *Id*. Here, too, the District Court was acting in accordance with *Briseno* and Fifth Circuit precedent. *Briseno* explicitly instructed courts, when making an *Atkins* determination, to consider factors like whether other people perceived an individual as intellectually disabled. *Briseno*, 135 S.W.3d at 18-19.

### b. The District Court's adaptive functioning analysis rested on unscientific bases.

Contrary to clinical standards, under *Briseno* and this Court's precedent, courts in the Fifth Circuit considered petitioners' adaptive strengths and weighed those strengths against a defendant's deficits in determining whether they met prong two of the *Atkins* determination. *See Henderson v. Stephens*, 791 F.3d 567, 568 (5th Cir. 2015) ("Under *Briseno*, the [court] was free to weigh all of the evidence of [petitioner's] limitations . . . although there was evidence in this record indicating that Henderson is intellectually disabled, there was also significant

evidence that he is not."); *Clark*, 457 F.3d at 447 ([C]ourts may consider adaptive strengths in making intellectual disability determinations because "evidence of a strength in a particular area of adaptive functioning necessarily shows that the defendant does not have a weakness in that particular area."). The District Court followed Fifth Circuit precedent by explicitly dismissing the clinical approach to adaptive functioning, stating that

> the mental health community ignores an individual's strengths when looking at adaptive functioning . . . The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently.

*Id*. at 32 (citations omitted); *see also id.* at 33 ("The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies."); *Ortiz v. United States*, 664 F.3d 1151, 1168-69 (8th Cir. 2011) (citing to the District Court's opinion in this case for the proposition that courts should consider adaptive strengths in the prong two analysis even though clinicians reject that approach).

Furthermore, the District Court again relied on the fact that Mr. Bourgeois did not fit erroneous stereotypes of intellectually disabled individuals to support the finding that prong two was not satisfied. The District Court credited testimony that Mr. Bourgeois was competent at his job, "[h]is appearance and grooming were beyond presentable, [and] none of the Government's witnesses suspected that

40

Bourgeois had mental impairments." *Id.* at 39. In asking whether the Government's witnesses thought Mr. Bourgeois was intellectually disabled, the District Court was relying on one of the *Briseno* factors specifically criticized by *Moore*. *Briseno* instructed courts to consider whether "those who knew the person best during the developmental stage—his family, friends teachers, employers, authorities—[thought] he was mentally retarded at that time, and, if so, act in accordance with that determination." *Moore*, 137 S. Ct. at 1051 (citing *Briseno*, 135 S.W.3d at 8). *Moore*, while rejecting *Briseno* in its entirety, singled out that factor for criticism, stating: "[B]ut the medical profession has endeavored to counter lay stereotypes of the intellectually disabled. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism." *Id.* (citing, *inter alia*, AAIDD-2012 at 25-27).

The District Court found it dispositive that Mr. Bourgeois did not *appear* to be intellectually disabled, and relied both on *Briseno* factors and erroneous stereotypes to reach this conclusion. *See Bourgeois* at 22 ("Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies.); *id.* (Bourgoeois trial testimony, colloquies with the Court, and writings never called into question his intellectual functioning); *Id.* at 28 ("Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts …"); *id.* (Mr. Bourgeois produces "voluminous amounts of writing[.]"); *id.* at 29 ("those who knew [Mr. Bourgeois] as an adult did not suspect that he was mentally

retarded."); *id.* (Petitioner "wrote intricate and detailed letters, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment."); *id.* (Government expert opined that having a job as a long-haul trucker was "inconsistent with mental retardation."); *id.* at 30 ("Bourgeois' extensive writings, while not polished masterpieces, certainly do not contain gross indicia of mental impairment."); *id.* at 30 ("During trial, Bourgeois communicated with this Court on several occasions . . . . Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child."); *id.* at 38 (Mr. Bourgeois was able to become proficient at driving, even though he initially had difficulty.); *id.* at 38-39 (describing Mr. Bourgeois' competence at his truck driving job); *id.* at 39(describing his well-groomed appearance); *id.* (his work as a truck driver belied any intellectual disability); *id.* at 43 ("Bourgeois can engage in the give-and-take of normal conversation without any hint of impairment.").

The District Court's reliance on all of these appearances and stereotypes was inappropriate under *Moore* and contrary to current clinical diagnostic guidelines. The District Court's reliance on Mr. Bourgeois' verbal abilities to rule out intellectual disability followed one of the *Briseno* factors which, as noted above, were rejected by a unanimous Supreme Court. *See also*, AAIDD-2012 at 20 (ID determinations should not be based on verbal behavior). The District Court's

finding that any of the characteristics would undermine a finding of intellectual disability constituted reliance on the commonly held, but erroneous, stereotypes which *Moore* rejected.  *See* AAIDD-2012 (incorrect stereotypes surrounding individuals with ID include, *inter alia*, that persons with ID "look and talk differently from persons in the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, and drive cars," "do not (and cannot) support their families," "cannot acquire vocational and social skills necessary for independent living,"  and "are characterized only by limitations and do not have strengths that occur concomitantly with their limitations").

In addition to focusing on Mr. Bourgeois' adaptive strengths, the District Court departed from clinical standards by treating risk factors as alternate explanations for Mr. Bourgeois' deficits. Referring to his poor academic performance, the District Court theorized that it may have been due to "his unstable home life" or "the hampering effects of a deprived home environment." *Bourgeois* at 84; *see also id.* at 90 ('[t]o the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse."). These, however, are all risk factors that *support* a diagnosis of intellectual disability. As *Moore* explains, an individual's "record of academic failure, along

with the childhood abuse and suffering he endured," are "traumatic experiences [that] count in the medical community as '*risk factors*' for intellectual disability. Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Moore* at 1051 (citing AAIDD-2010, at 59-60) (emphasis in original).The AAIDD lists "lack of adequate stimulation," "inadequate family support," and "family poverty" as risk factors for intellectual disability. AAIDD-201011 at 60. The District Court also noted that Mr. Bourgeois' "school records do not show any accommodation for mental retardation," *Bourgeois* at 85, as evidence that he was not intellectually disabled, while "inadequate special education services" is recognized as a risk factor by the AAIDD. AAIDD-2010 at 60.

Similarly, the District court treated comorbidities as alternative explanations to Mr. Bourgeois' deficits, rather than supporting evidence of his adaptive deficits, as is appropriate under clinical standards. As noted *supra*, *Moore* rejected any requirement that defendants prove that adaptive deficits were not related to other mental health issues as "mental-health professionals recognize [that] many intellectually disabled people also have other mental or physical impairments." *Moore*, 137 S. Ct. at 1051 (citing AAIDD-2010 a 58-63; DSM-5 at 40). The District Court took the opposite approach to comorbidities, and minimized Mr. Bourgeois' poor adaptive behavior because it was "more likely related to his

personality disorder, especially his impulsivity and sense of entitlement."

*Bourgeois* at 86.

## III. THE BAR AGAINST SUCCESSIVE PETITIONS RAISING CLAIMS PRESENTED IN A PRIOR PETITION DOES NOT APPLY TO PRISONERS IN FEDERAL CUSTODY.

Finally, the successor bar found in 28 U.S.C. § 2244(b)(1) does not apply to federal prisoners. Section 2244 states that a "claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1) (emphasis added). The statute is conspicuously silent on claims presented in petitions brought under § 2255 and, by its plain language, makes clear that Congress intended for that section to apply only to claims brought by state prisoners pursuant to 28 U.S.C. § 2254, not to claims brought by federal prisoners, like Mr. Bourgeois, pursuant to § 2255.

Under the rule of statutory construction *expressio unius est exclusion alterius* ("the expression of one thing implies the exclusion of the other"), Congress' specific reference to applications brought under § 2254 and its simultaneous lack of reference to § 2255 applications demonstrates that it intended to exclude § 2255 applications from the successor bar of § 2244(b)(1). *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (applying the principle of *expressio unius est exclusion alterius*); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (same); *Tennessee*

*Valley Auth. V. Hill*, 437 U.S. 153, 187 (1978) (same); *Hodge v. United States Dep't of Justice*, 929 F.2d 153 (5th Cir. 1995) (same). Because the successor bar found in § 2244(b) does not apply to Mr. Bourgeois, he need only make a prima facie showing that he complies with § 2255(h)(2) for this Court to authorize him to raise his *Atkins* claim in a second motion.

## CONCLUSION

Mr. Bourgeois has established that he is intellectually disabled and is entitled to relief pursuant to *Atkins.* At a minimum, he has made a prima facie case that his *Atkins* claim has merit. However, because the District Court was following this Circuit's precedent and relied on non-clinical standards to make the intellectual disability determination in this case, *Atkins* was functionally unavailable to Mr. Bourgeois at the time of his initial § 2255 motion. Furthermore, Mr. Bourgeois has presented a prima facie showing that the requirements of § 2255(h)(2) are satisfied.

WHEREFORE Mr. Bourgeois respectfully requests that his Motion For Order Authorizing The Southern District Of Texas To Consider A Successive Petition Under 28 U.S.C. § 2255 be granted.

Respectfully submitted,

/s/ Victor Abreu
Victor Abreu
Stuart Patchen
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Victor_Abreu@fd.org
Stuart_Patchen@fd.org

Counsel for Petitioner

Dated: March 27, 2018

<h1 style="text-align: center;"><b><u>Certificate Of Service</u></b></h1>

I, Victor Abreu, hereby certify that on the 27th day of March, 2018, I served the foregoing on the following person by first class mail, postage prepaid on:

Carmen Castillo Mitchell, Esq.
United States Attorney's Office
1000 Louisiana Street, Suite 2300
Houston, TX 77002-5010

Julie Hampton, Esq.
United States Attorney's Office
800 N. Shoreline Blvd., #100
Corpus Christi, TX 78401

Counsel for Respondent/Appellee

/s/ Victor Abreu
Victor Abreu

<h1 style="text-align: center;"><b><u>Certificate of Compliance with Rule 32(a)</u></b></h1>

1.  This proposed Motion contains 10,767 words.

2.  The motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(7)(b)because this document has been prepared in a proportionally spaced typeface using Microsoft Word 10.0 in 14 point Times New Roman.

/s/ Victor Abreu
Victor Abreu